2007-NMCA-004

149 P.3d 945

Jerome C. ROMERO, Appellant–
Petitioner/Cross–
Respondent,

v.

Board of COUNTY COMMISSIONERS
OF the County of RIO ARRIBA, Ap-
pellee–Respondent/Cross–Petitioner.

Nos. 24,147, 24,180.

Court of Appeals of New Mexico.

Aug. 29, 2006.

Certiorari Granted, No. 30,057,
Nov. 29, 2006.

## OPINION

ROBINSON, Judge.

{1} The parties appeal from a district court order partially affirming and partially reversing the decision of the Rio Arriba County (County) Board of County Commissioners (Board) entered on May 30, 2003. Jerome Romero (Romero) claims that he is entitled to mine a 14.5–acre parcel of his land as a grandfathered, non-conforming use. On appeal, he claims that the district court erred in affirming the Board's decision that Romero is not entitled to mine 9.5 of the 14.5 acres. The Board also appeals, claiming that the district court erred in reversing the Board's determination that Romero was no longer entitled to mine 5 of the 14.5 acres, which were considered a grandfathered, non-conforming use in 1998. We reverse in part, affirm in part, and remand.

### I. BACKGROUND

{2} Romero is the owner of a 37.964–acre parcel of land in Rio Arriba County. On August 31, 1995, the Board passed Ordinance No.1996–1 entitled "Design and Development Regulation System" (Ordinance 1996–1). Under Ordinance 1996–1, a property owner with a legal, non-conforming use that predated the enactment of Ordinance 1996–1 was not required to obtain zoning approval. However, any enlargement, expansion, or extension of the non-conforming use was prohibited unless approved by the zoning committee.

{3} On February 27, 1998, Española Transit Mix (ETM), with authorization from Romero, notified the County Planning and Zoning Department (Department) of its proposal to "develop a sand and gravel material source" on 14.5 acres of the land owned by Romero. On March 18, 1998, the Department's Director held a hearing and approved gravel mining on 5 of the 14.5 acres as a grandfathered, non-conforming use. During a meeting held on April 29, 1998, after complaints from local residents, the Planning & Zoning Committee overturned the Director's decision. However, on May 28, 1998, the Board voted in favor of denying the appeal of the Director's decision. [RP 240–242] At a

Scheuer, Yost & Patterson, P.C., Byron L. Treaster, Santa Fe, NM, for Petitioner/Cross–Respondent.

Rubin Katz Law Firm, Frank T. Herdman, Brenden J. Murphy, Santa Fe, NM, for Respondent/Cross–Petitioner.

special meeting of the Board on July 15, 1998, after hearing the appeal of concerned citizens, the Board approved the grandfathered, non-conforming use of the 5 acres and reaffirmed that the Department would monitor the community's concerns. Local residents appealed the Board's decision to the district court, naming the County and Romero as defendants in *Calabaza v. Rio Arriba Board of County Commissioners,* No. D–0117–CV–0009801573. The *Calabaza* appeal was dismissed in October 1999.

{4} Romero did not appeal the findings of the Director and the Board that he was only entitled to mine 5 acres as a grandfathered use. However, with some encouragement from the Department and the County, Romero and ETM continued to seek the Board's approval to mine the additional 9.5 acres. On October 9, 1998, Romero filed a "Development Permit Application" with the Department, seeking approval to mine the additional 9.5 acres. He also submitted a "Storm Water Pollution Prevention Plan" and other information requested by the County.

{5} On August 26, 1999, the County adopted the "Rio Arriba County Design and Development Regulation System Ordinance 2000–01" (Zoning Ordinance), which designates the entire County as a county agricultural district. Permitted uses under the Zoning Ordinance include agriculture, single-family dwellings, public parks, mobile homes, and roadside vending stands with a County vendor's permit. Article 1, Section IX.A of the Zoning Ordinance provides that legal, non-conforming uses, existing as of the effective date of that Ordinance, "shall be allowed to continue but any enlargement, physical expansion or extension of the non-conforming use" is prohibited absent compliance with the requirements of the Ordinance.

{6} On August 26, 1999, the County adopted the "Rio Arriba County Sand and Gravel Mining Ordinance 2000–02" (Sand and Gravel Ordinance), containing regulations for existing and proposed gravel mining. Article 7 of the Sand and Gravel Ordinance requires existing, grandfathered mining and gravel operations to provide the Planning Director with a description of operations within ninety days after the effective date of the Ordinance. Article 7 also requires owners with established non-conforming mining uses to submit the documents required under Article 3, Section 2 of the Ordinance within 180 days of the effective date of the Ordinance. Article 3, Section 2 of the Sand and Gravel Ordinance, sets out performance and development standards that must be met to obtain a mining permit.

{7} On February 22, 2000, Romero sent a letter to the Department with accompanying documentation to comply with Article 3, Section 2 of the Sand and Gravel Ordinance, urging that the entire 14.5 acres be considered a grandfathered, non-conforming use under Article 7 of that Ordinance. At the same time, he submitted a Development Permit Application, requesting a zoning permit. The Department denied Romero's application and zoning permit request by letter decision on February 25, 2000. The Department's grounds for this denial were that (1) Romero failed to meet the ninety-day notice provision for grandfathered, non-conforming uses set forth in Article 7 of the Sand and Gravel Ordinance; (2) Romero's materials did not comply with Article 3, Section 2 of that Ordinance; (3) any additional mining would constitute physical enlargement and/or expansion; (4) there was no proof of a legal, non-conforming use; and (5) there had been no mining activity for a period of six months. The Department informed Romero that he needed to complete an application pursuant to the requirements of the Sand and Gravel Ordinance.

{8} Romero appealed the Department's denial to the Planning and Zoning Committee, which recommended that the Board uphold the Department's denial. Romero then appealed to the Board, which affirmed the denial on December 3, 2001. The Board concluded that (1) Romero was not engaged in mining on his property as of the effective date of the Zoning and Sand and Gravel Ordinances (2000 Ordinances); (2) Romero's proposal to mine and extract gravel would constitute an enlargement, expansion, and extension of any prior mining activity that may have occurred within the previously permitted 5–acre area; (3) the proposal would entail activities "substantially and materially different from intermittent hauling of materials from existing stockpiles"; (4) Romero's

failure to comply with Article 7 of the Sand and Gravel Ordinance nullified any obligation of the County to pursue an investigation of a claim for non-conforming use; (5) the diminishing assets doctrine, assuming it is recognized in New Mexico, does not apply in this case because sand and gravel mining is not a non-conforming use on the property and because Romero lacked the intent to mine beyond the 5–acre area that was the subject of the 1998 permit; (6) the validity of the Ordinance 1996–1 is not relevant to Romero's appeal and, to the extent Romero is challenging the 1998 permit, the challenge is untimely; and (7) requiring Romero to comply with the 2000 Ordinances does not constitute an unconstitutional taking.

{9} Romero appealed to the district court pursuant to Rule 1–074 NMRA. The district court partially reversed and partially affirmed the Board's decision. It affirmed the Board's denial of mining on the additional 9.5 acres, finding that there was insufficient, contradictory evidence regarding any existing, non-conforming use on the 9.5 acres, and that any mining on these acres would constitute a new or expanded operation separate and apart from the non-conforming use established on the 5 acres. It reversed the Board's denial regarding the legal, non-conforming use on the grandfathered 5–acre sand and gravel operation, determining that Romero had not discontinued non-conforming use for the requisite six-month period. It also determined that the Board had received sufficient notice to comply with the description of operations required by Article 7 of the Sand and Gravel Ordinance.

{10} Romero filed a motion to amend, or for rehearing on the judgment, which was denied. Romero and the Board petitioned this Court for a writ of certiorari to review the decision of the district court. We granted the petitions and consolidated the cases for appeal.

## II. DISCUSSION

{11} Romero raises five issues on appeal arguing that (1) the Ordinance 1996–1 is void for lack of substantial compliance with statutory publication and filing requirements; (2) because the Ordinance 1996–1 is void, the Board's 5–acre mining limit, imposed in March 1998, is also void; (3) the diminishing assets doctrine should be adopted by this Court to protect Romero's vested right to expand mining; (4) the district court erred in upholding the Board's decision on the ground that expansion of mining from 5 acres to 14.5 acres would have an adverse impact on the neighborhood when the Board's decision contained no such findings and conclusions; and (5) Romero has vested property rights, compensable under the New Mexico Constitution, that were damaged by the Board's illegal or improper land use decisions. The Board also appeals, claiming that the district court erred in reversing the Board's finding that Romero did not have a valid non-conforming use to mine 5 acres of his property at the time the 2000 Ordinances were adopted.

## A. STANDARD OF REVIEW

{12} In reviewing a decision of an administrative agency, we apply the same statutorily-defined standard of review applied by the district court. *Rio Grande Chapter of Sierra Club v. N.M. Mining Comm'n*, 2003–NMSC–005, ¶ 17, 133 N.M. 97, 61 P.3d 806. We will not reverse an agency's final decision unless "it is arbitrary, capricious, or an abuse of discretion; not supported by substantial evidence in the record; or, otherwise not in accordance with law." *Id.*; NMSA 1978, § 39–3–1.1(D) (1999); NMSA 1978, § 3–21–9 (1999). "A ruling by an administrative agency is arbitrary and capricious if it is unreasonable or without a rational basis, when viewed in light of the whole record." *Rio Grande Chapter*, 2003–NMSC–005, ¶ 17, 133 N.M. 97, 61 P.3d 806. "In reaching our conclusion, we do not substitute our judgment for that of the administrative body." *Atlixco Coal. v. County of Bernalillo*, 1999–NMCA–088, ¶ 11, 127 N.M. 549, 984 P.2d 796. "[W]e look to the whole record and examine all the evidence presented, both that which supports as well as that which contradicts the action taken." *Id.* We view the evidence in the light most favorable to the Board and, even if we would have come to a different conclusion had we been the fact finder, we "only evaluate whether the record supports the result reached, not whether a different result could have been reached." *Gallup Westside Dev., LLC v. City of Gallup,*

2004–NMCA–010, ¶ 11, 135 N.M. 30, 84 P.3d 78.

## B. VESTED RIGHTS TO 5 ACRES AS A CONTINUING GRANDFATHERED, NON–CONFORMING USE

{13} The district court determined that the Board's decision that the existing 5–acre mine site was not a legal, non-conforming use pursuant to Article 7 of the Sand and Gravel Ordinance, was not supported by substantial evidence, and was arbitrary and capricious. Therefore, the court reversed the Board's decision and concluded that Romero could continue the sand and gravel operation on the 5 acres. The Board contends that substantial evidence supports the Board's determination that there was no ongoing activity on the 5 acres on the effective date of the 2000 Ordinances. We disagree with the Board's findings.

{14} The general rule is that the non-conforming use must be present at the time of the enactment of the restrictive ordinance. *City of Las Cruces v. Huerta*, 102 N.M. 182, 185, 692 P.2d 1331, 1334 (Ct.App. 1984). In the 1998 hearings, it was established that Romero was lawfully using 5 acres of his property for mining at the time the County enacted the Ordinance 1996–1 limiting such use. Therefore, in 1998, Romero had a legal, non-conforming use on 5 acres of his property. *See id.* at 184–85, 692 P.2d at 1333–34. As a non-conforming use, the 5 acres of mining was not subject to immediate termination, unless the use had been abandoned by the time the 2000 Ordinances became effective. *See Tex. Nat'l Theatres, Inc. v. City of Albuquerque*, 97 N.M. 282, 287, 639 P.2d 569, 574 (1982). In general, abandonment of a non-conforming use requires an intent to permanently abandon the non-conforming use and an overt act, or a failure to act, which implies that the owner no longer claims or retains an interest in the non-conforming use. *See id.* However, intent is not required if an ordinance contains a specific provision, stating that a discontinuance, which persists for a specified time period, will automatically terminate the right to resume the non-conforming use. *See id.* (citing 82 Am.Jur.2d *Zoning & Planning* § 220, at 742 (1976)).

{15} Here, Article 1, Section IX(B) of the Zoning Ordinance defines abandonment of a non-conforming use as a discontinuance for a period of six consecutive months or more. The 2000 Ordinances were adopted on August 26, 1999, and published on September 2 and 9, 1999. We thus turn to whether Romero discontinued his previously established, non-conforming use on the 5 acres of property for a period of six consecutive months by September 1999, the effective date of the 2000 Ordinances or, at some point, before the Department's letter denying Romero's claim on February 25, 2000.

{16} Romero claims there was steady activity, although not major activity, at the time the 2000 Ordinances were enacted. We agree. Evidence introduced at the Committee hearings, on October 3 and 24, 2001, suggests continuing use. At the hearing on October 3, 2001, Romero provided a history of extraction and hauling with accompanying receipts, invoices, and checks. The invoices and receipts reflect activity from March 1998, through September 1999, after the effective date of the 2000 Ordinances. Additional invoices reflect activity from October 1999, until March 2000, after the Director had incorrectly determined that mining had discontinued for a period of six months or more. At the hearing on October 24, 2001, Romero introduced evidence, showing that the County had continued to inspect Romero's 5–acre mine, to determine compliance with the 5–acre limit up to the time of the 2000 Ordinances. Witnesses stated there was activity, even if it only amounted to the removal of stockpiled materials.

{17} The foregoing constitutes substantial evidence, supporting the district court's determination that the 5–acre mine was in operation at the time the County enacted the 2000 Ordinances. Moreover, we are unpersuaded that the evidence relied upon by the Board is sufficient to support its contention that Romero had abandoned his valid, non-conforming use by the time the 2000 Ordinances were adopted. We observe that some of the evidence relied upon by the Board is disputed by the record. For example, the Board relies on Romero's alleged statement that extraction of new material within the

permitted 5–acre area had been exhausted. Review of the testimony cited by the County indicates that it was the County's Assistant Planning Director, Gilbert Chavez, not Romero, who characterized the 5 acres as "exhausted." Romero merely stated that materials on the 5 acres were being "hauled off" and, as far as removing materials from the 5 acres, he was no longer allowed to do so by the County. The Board also relies on the statement of Romero's counsel, in a letter dated December 9, 1998, that Romero had "already mined" 5 acres. However, this statement appears to address the acreage where Romero had already been mining, not that the mining had been completed or terminated.

{18} The Board also relies on the testimony of Patricio Garcia, the County's Planning Director, and Gilbert Chavez, the County's Assistant Planning Director, that as of the effective date of the 2000 Ordinances, there was no ongoing mining activity. However, review of their testimony indicates that they may have only considered whether actual extraction was ongoing. Chavez asked whether pulling out the stockpiles would constitute sufficient activity. He also testified that he never asked Romero for receipts that would support Romero's claim of ongoing activity because Romero had failed to meet the ninety-day notice requirement. Furthermore, although Garcia testified that there was no ongoing mining activity on August 27, 1999, his testimony was based on a visual inspection showing two pits, two mountains of gravel and, at most, minimal removal of earth or dirt. He did not address whether anyone was hauling away previously extracted materials from the 5 acres. Finally, the Board claims that the only evidence presented concerning Romero's use of the 5–acre parcel near the effective date of the 2000 Ordinances was his contradicted statement that he allowed third parties to remove sand and gravel from existing stockpiles. We disagree that this testimony was contradicted in light of the evidence reviewed above.

{19} The Board's argument is based upon its contention that, in order to conduct ongoing activity, Romero must be extracting new materials from the ground. We disagree. There is no definition of mining in the Sand and Gravel Ordinance, and nothing in the Zoning Ordinance, requiring Romero to extract new material from the ground, or to conduct major activity to continue his nonconforming use. Therefore, the intermittent removal and hauling from existing stockpiles is enough to constitute ongoing, non-conforming activity, and we agree with the district court that "whatever existing activity or remaining mining activity on the five acres can be completed, [Romero is] entitled to do so on the existing five acre parcel." See Hansen Bros. Enters., Inc. v. Bd. of Supervisors, 12 Cal.4th 533, 48 Cal.Rptr.2d 778, 907 P.2d 1324, 1345 (1996) (stating that, when "determining the use to which the land was being put at the time the use became non[-]conforming, the overall business operation must be considered"); Town of W. Greenwich v. A. Cardi Realty Assocs., 786 A.2d 354, 360–61 (R.I.2001) (holding that diminishing excavation activity does not establish abandonment of a non-conforming use and the landowner's activities in removing truckloads of earth from the site each year was sufficient to establish a continuing, non-conforming use); Ernst v. Johnson County, 522 N.W.2d 599, 604 (Iowa 1994) (holding that minimal continued use of the quarry, along with maintenance of requisite licenses and permits, was enough to establish uninterrupted operation).

## C. DIMINISHING ASSETS DOCTRINE

{20} When Romero appealed the Department's denial to the Planning and Zoning Committee, the Board concluded that the diminishing assets doctrine was inapplicable because sand and gravel is not a non-conforming use on Romero's property and Romero lacked the intent to mine beyond the 5–acre area. Even though there is no evidence of an actual non-conforming mining use on the 9.5 acres at the time the Zoning Ordinance became effective, Romero urges us to adopt the diminishing assets doctrine and to hold that he has a vested property right to expand his sand and gravel business to an additional adjoining 9.5 acres.

{21} The diminishing assets doctrine is an exception to the enforceability of zoning laws designed to terminate non-conforming uses. The decision of whether to adopt the

diminishing assets doctrine is a question of law, which we review de novo. *See Rio Grande Chapter,* 2003–NMSC–005, ¶ 17, 133 N.M. 97, 61 P.3d 806. Application of the diminishing assets doctrine to the facts of this case is a mixed question of law and fact. *See Huerta,* 102 N.M. at 185, 692 P.2d at 1334. This Court will not reverse an agency's decision unless there is "an abuse of discretion[ ] not supported by substantial evidence in the record[ ] or, otherwise not in accordance with law." *Rio Grande Chapter,* 2003–NMSC–005, ¶ 17, 133 N.M. 97, 61 P.3d 806.

{22} Article 1, Section IX(A) of the Zoning Ordinance provides that "legal non-conforming uses shall be allowed to continue but any enlargement, physical expansion or extension of the non-conforming use or structure is prohibited unless the non-conforming use or structure is brought into compliance with the requirements of this Ordinance." Nonetheless, when it comes to the extraction of earth materials and the lateral expansion of such extraction, other jurisdictions are reluctant to prohibit the expansion of a non-conforming use. *A. Cardi Realty Assocs.,* 786 A.2d 354; *Stephan & Sons, Inc. v. Municipality of Anchorage Zoning Bd.,* 685 P.2d 98 (Alaska 1984); *McCaslin v. City of Monterey Park,* 163 Cal.App.2d 339, 329 P.2d 522 (1958); *County of Du Page v. Elmhurst–Chicago Stone Co.,* 18 Ill.2d 479, 165 N.E.2d 310 (1960); *Town of Billerica v. Quinn,* 320 Mass. 687, 71 N.E.2d 235 (1947); *Town of Wolfeboro v. Smith,* 131 N.H. 449, 556 A.2d 755 (1989).

{23} In *A. Cardi Realty Associates,* the Rhode Island Supreme Court determined that, under the diminishing assets doctrine, a landowner could expand a pre-existing non-conforming earth and gravel removal business where the landowner was engaged in such a business on the property prior to passage of the zoning ordinance. That court expressed that "[t]he doctrine of diminishing assets has evolved from the recognition that extractive industries use the land itself and all resources that are found on a given parcel comprise the ongoing business." 786 A.2d at 362. That court further recognized that "courts have acknowledged that the amount and frequency of the recovery of the material is driven by market forces, varies with the seasons and fluctuates with the needs of the industries that depend on the resource." *Id.* at 363.

{24} Moreover, "[u]nlike other non[-]conforming uses of property which operate within an existing structure or boundary, mining uses anticipate extension of mining into areas of the property that were not being exploited at the time a zoning change caused the use to be non[-]conforming." *Hansen Bros. Enters., Inc.,* 48 Cal.Rptr.2d 778, 907 P.2d at 1336. "Only by allowing the continued excavation of land previously appropriated for that use would an owner truly be able to continue an excavation which he had begun" at the time the zoning ordinance was enacted. *Smith,* 556 A.2d at 758 (internal quotation marks omitted). Therefore, as the court expressed in *Hansen Brothers Enterprises,* when "there is objective evidence of the [land] owner's intent to expand a mining operation, and that intent existed at the time of the zoning change," the diminishing assets doctrine protects the unique character of land that has been reserved for excavation and allows expansion into those areas. 48 Cal.Rptr.2d 778, 907 P.2d at 1336.

{25} In *Smith,* the New Hampshire Supreme Court adopted a three-pronged test that a landowner must satisfy to establish a right to expand operations as a non-conforming use.

> First, [the land owner] must prove that excavation activities were actively being pursued when the [Ordinance] became effective; second, [the land owner] must prove that the area that he desires to excavate was clearly intended to be excavated, as measured by objective manifestations and not by subjective intent; and, third, [the land owner] must prove that the continued operations do not, and/or will not, have a substantially different and adverse impact on the neighborhood.

556 A.2d at 759. In addition, under the diminishing assets doctrine, the burden of establishing an intent to excavate an area falls on the party relying on the doctrine. *Id.* at 760 (holding that "[t]he burden of proving the 'intent' to excavate an area larger than that already excavated falls on the party claiming an exemption under the

grandfather clause"); *Township of Fairfield v. Likanchuk's, Inc.,* 274 N.J.Super. 320, 644 A.2d 120, 125 (Ct.App.Div.1994) (holding that, in order to benefit from the diminishing assets doctrine, "the owner must show that the entire tract was dedicated to the mining activity despite the fact that the activity was limited when it was rendered a non[-]conforming use" (internal quotation marks omitted)). "[E]vidence merely demonstrating that an owner *planned* to expand at a later point or *intended* to expand into a given area" is insufficient to constitute an objective manifestation of intent to excavate the entire 14.5 acres. *A. Cardi Realty Assocs.,* 786 A.2d at 363–64; *see Stephan & Sons, Inc.,* 685 P.2d at 102 ("The mere intention or hope on the part of the landowner to extend the use over the entire tract is insufficient; the intent must be objectively manifested by the present operations."); *Likanchuk's, Inc.,* 644 A.2d at 125 (holding that unexpressed intention or hope is not enough; "[i]ntent must be *objectively* manifested by the initial and ongoing operation of the owner before the activity was rendered nonconforming by the newly-adopted regulation").

{26} Since we have determined that a non-conforming use has been established on Romero's 5–acre area, we hold that a landowner, under the diminishing assets doctrine, may expand pre-existing, non-conforming earth and gravel removal pursuant to the *Smith* analysis. In our case, the Board found and the district court determined that Romero had not established the requisite "objective manifestations" of an intent to mine beyond the 5–acre area. Thus, we turn to the second prong of the *Smith* analysis to determine whether Romero objectively manifested an intent to expand his operation beyond the 5–acre area.

{27} First, on February 27, 1998, prior to the adoption of the Zoning Ordinance, ETM, with authorization from Romero, notified the Department of its proposal to "develop a sand and gravel material source" on the 14.5 acres of land owned by Romero for which the Board previously only allowed the mining of the 5–acre area. Here, the Board contends that since "Romero did not have a non[-]conforming use to engage in renewed sand and gravel mining and, for that basis alone, the [Board] properly concluded that

the diminishing assets doctrine is not applicable." Further, the Board also adopted, in its findings and conclusions, that (1) in 1998, Romero requested the County's approval to mine the 14.5 acres, which it denied, and he failed to challenge that decision; (2) Romero had not mined gravel beyond the 5–acre area; (3) after issuance of the 1998 permit, Romero did not have an application pending with the County for mining on areas beyond the 5–acre area; and (4) concluded that the "diminishing assets doctrine ... is not otherwise applicable in this case because ... sand and gravel mining is not a non[-]conforming use on the property and ... Romero lacked the intent to mine beyond the [5]-acre area that was the subject of the 1998 permit." We disagree.

{28} Evaluation of Romero's activities prior to the enactment of the 2000 Ordinance establishes substantial evidence to the contrary. The Board and the Department encouraged Romero to resubmit an application; thus, Romero submitted an additional application for expanded mining to the Board on October 9, 1998. However, since this application was marked "Zoning Use Change," the Board contends that Romero did not intend to expand his current operations, but to develop a new one. We again disagree because, subsequent to the filing of this application, Romero's counsel communicated his intentions to expand his current operations and the application of the diminishing assets doctrine to the Board. Romero also supplemented this application with his gravel mine operation plan, which refers to Romero's gravel mine as being "approximately 14 acres in the area with approximately 5 acres currently disturbed." Further, prior to the public hearing on this application, the Board received a drainage report referring to the 5 acres and the expansion. Thus, any misunderstanding was certainly clarified by these subsequent correspondences by Romero. Meanwhile, instead of issuing a ruling on Romero's application to the additional 9.5 acres, the County subsequently adopted the Zoning Ordinance, prohibiting the expansion of non-conforming uses.

{29} It is irrational and unreasonable to hold Romero at fault for not appealing the

Board's denial of his application to expand under these circumstances. First, the Board encouraged Romero to resubmit an application. Second, Romero, relying on this, resubmitted an application and, while waiting for a ruling, the Board instead adopted the Zoning Ordinance, eliminating his chances to expand his operation outright. Lastly, the Board concluded that Romero did not meet one of the essential elements of the diminishing assets doctrine because it determined that Romero had not mined gravel beyond the 5–acre area, suggesting he abandoned his intentions to mine beyond the 5–acre area. We find the Board's reasoning to be perplexing because, in essence, the Board is saying that because Romero obeyed the Ordinance 1996–1 not to mine beyond the 5–acre area, they are now going to find that he abandoned his intentions to do so. This deduction is irrational and unconscionable. In any event, Romero, never having actually mined the 9.5 acres, while perhaps probative, is not a bar to application of the diminishing assets doctrine. For instance, the diminishing assets doctrine is applicable where a non-conforming use exists on the land intended for expansion. *See, e.g., Stephan & Sons, Inc.*, 685 P.2d at 101–02 (stating that the diminishing assets doctrine holds that an owner of the non-conforming use may sometimes be found to have a vested right to use an entire tract, even though only a portion of the tract was used when the restrictive ordinance was enacted).

■ {30} Moreover, there is no indication that Romero utilized his acreage for any other commercial use, other than the sand and gravel mining. Based on the foregoing, we conclude that there was substantial evidence establishing Romero's objective manifestation of his intent to mine beyond the 5–acre area. *See Hansen Bros. Enters., Inc.*, 48 Cal.Rptr.2d 778, 907 P.2d at 1336 (holding that "[w]hen a mining or quarrying operation is a lawful non[-]conforming use, progression of the mining or quarrying activity into other areas of the property is not necessarily a prohibited expansion ... of the non[-]conforming use"). "When there is an objective evidence of the owner's intent to expand a mining operation, and that intent existed at the time of the zoning change, the use may expand into the contemplated area." *Id.* Ac-

cordingly, the Board's findings that Romero had not established the requisite objective intent to expand beyond the 5–acre area was irrational and improper.

■ {31} Now, we must determine whether the third prong of the *Smith* analysis is satisfied and determine whether the mining will have "a substantially different and adverse impact on the neighborhood." 556 A.2d at 759. In our case, the Board never reached a decision or heard any evidence on whether Romero's mining on the 5–acre or the 9.5 acres would have an adverse impact on the neighborhood. Instead, the district court suggested that the adverse impact of Romero's proposed expansion was a legally recognized ground for denying application of the diminishing assets doctrine, despite the complete lack of evidence regarding adverse neighborhood impact at the administrative hearings. The Board made no findings on whether the adverse impact of expansion of the non-conforming use would be worse in kind and degree than the adverse impact resulting from the mining prior to the adoption of the Zoning Ordinance. *See id.* (stating that landowner shall not be restricted if "continued operations do not, and/or will not, have a substantially different and adverse impact on the neighborhood" than the operation conducted before the zoning ordinance was enacted). Furthermore, it is not the function of the district court, nor this Court, to substitute its judgment for that of an administrative agency. *See Atlixco Coal.*, 1999–NMCA–088, ¶ 11, 127 N.M. 549, 984 P.2d 796.

{32} Since we have adopted the diminishing assets doctrine, we need not address the validity of the Ordinance 1996–1, nor Romero's unconstitutional takings claim.

## III. CONCLUSION

{33} For the reasons set forth above, the judgment of the district court (1) that the existing 5–acre mine site was a legal, nonconforming use is affirmed; and (2) that there was insufficient evidence to adopt the diminishing assets doctrine is reversed. This case is remanded to the district court with instructions to remand to the Rio Arriba

Board of County Commissioners for further proceedings in accordance with this opinion.

{34} **IT IS SO ORDERED.**

I CONCUR: RODERICK T. KENNEDY, Judge.

JONATHAN B. SUTIN, Judge, specially concurring.

SUTIN, Judge (specially concurring).

{35} I concur in the result of the majority's opinion.

{36} This case is troublesome and has been very difficult to review. The manner in which both Romero and the County proceeded throughout the period in question leaves much to be desired. The facts in this case can be viewed differently. Under the standard of review, neither we nor the district court are to engage in fact finding. The review here is whether the Board's decisions are supported by substantial evidence, whether they are arbitrary or capricious, and whether they are in accordance with law. The answers to these questions are not cut and dried. One can have a reasonable hesitation to withhold the usual deference given to the findings of a board of county commissioners in planning and zoning matters. Yet one can also have a reasonable hesitation to permit counties through planning and zoning ordinances to arbitrarily or otherwise improperly restrict use of private property. Here, a portion of the property was successfully used for mining sand and gravel, with a contiguous part of the acreage apparently intended and available for further sand and gravel mining.

{37} I am impressed by the fact that the earth and gravel removal business is a unique one, in that landowners must start in one place and continually expand to more land. Thus, "quarrying, as a non[-]conforming use, cannot be limited to land actually excavated at the time of enactment of the restrictive ordinance because to do so would, in effect, deprive the landowner of his use of the property as a quarry." *Syracuse Aggregate Corp. v. Weise,* 51 N.Y.2d 278, 434 N.Y.S.2d 150, 414 N.E.2d 651, 655 (1980). By its very nature, land intended for quarry development over time can, under certain circumstances, be a non-conforming use. Unless there exists a lawful basis on which to restrict the physical expansion or extension of the mining, the continuation of the mining should be considered a proper existing nonconforming use. The focus in this case is necessarily on the extent of the non-conforming use at the time of the enactment of the 2000 ordinances, and on the landowner's manifestation of intent at that time to mine additional acreage. "[T]he nature of the incipient non[-]conforming use, in light of the character and adaptability to such use of the entire parcel, manifestly implies an appropriation of the entirety to such use prior to the adoption of the restrictive ordinance." *Id.* 434 N.Y.S.2d 150, 414 N.E.2d at 654 (internal quotation marks and citation omitted).

{38} It appears to me that Romero did manifest some intent to expand, but after the Board first denied him any right to do so, he could not begin mining. I agree with the majority that Romero did enough from the Board's first decision to the time of the enactment of the 2000 ordinances to come within the diminishing assets doctrine's element of manifestation of intent. I also agree that the Board's decision to the contrary was not based on substantial evidence and also evidenced a somewhat arbitrary result.

{39} I am convinced that the result reached by the majority is the fair and right result under the circumstances. I agree that we should adopt and apply the diminishing assets doctrine. I think the better judgment in this case is to err on the side of the landowner, as the majority has done, and leave the ultimate and perhaps only real issue of adverse neighborhood impact to be decided on remand, again as the majority has also done.